UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HARTFORD INSURANCE COMPANY OF THE MIDWEST, | ) CASE NO. CV 11-9092 MMM (CWx) |
| Plaintiff, | ) ORDER GRANTING PLAINTIFF'S ) MOTION FOR SUMMARY JUDGMENT |
| vs. | ) |
| PRICE POSTEL AND PARMA LLP, | ) |
| Defendant. | ) |

On November 2, 2011, Hartford Insurance Company of the Midwest commenced this action for declaratory relief against its insured, Price Postel and Parma LLP.[1] On July 16, 2012, Hartford filed a motion for summary judgment on its declaratory relief and reimbursement of the defense costs claims. It asserts it had no duty to defend Price.[2] In the alternative, Hartford seeks a declaration that it is entitled to reimbursement of fees and costs incurred in connection with non-covered claims. Price opposes the motion, and requests that the court enter an order *sua sponte*

---

[1]Complaint, Docket No. 1 (Nov. 2, 2011).

[2]Motion for Summary Judgment, Docket No. 15 (July 16, 2012).

finding that Hartford had a duty to defend the underlying action.[3]

The sole issue raised by the motion is whether Hartford was obligated to defend Price under the commercial general liability it issued to the firm.

## I. FACTUAL BACKGROUND[4]

### A.    The Hartford Policy

Hartford insured Price under commercial general liability policy number 72 UUNAH5803, which had effective dates of October 28, 2008 to October 28, 2009 ("Policy"). The Policy provided personal and advertising injury coverage, that is, coverage for claims of

> "injury, including consequential 'bodily injury' arising out of one or more of the
> following offenses: . . . Oral, written or electronic publication of material that
> slanders or libels a person or organization or disparages a person's or
> organization's goods, products or services; . . . h. Discrimination that results in
> humiliation or other injury to the feelings or reputation of a person (modified by
> Endorsement HC 0095 01-06)."[5]

---

[3]Opposition to Hartford's Motion for Summary Judgment ("Opposition"), Docket No. 24 (Aug. 3, 2012).

[4]The parties agree that all facts material to disposition of the motion are undisputed. (Defendant's Statement of Genuine Disputes in Opposition to Hartford's Motion for Summary Judgment ("SGI"), Docket No. 25 (Aug. 3, 2012) (stating that, with one qualification, "the material facts set forth in Hartford's separate statement are undisputed"). Hartford asserts that "the defamation claim was dismissed at the close of Clemmons['] case at the arbitration for lack of evidence." (Hartford Insurance Company of the Midwest's Separate Statement of Uncontroverted Facts and Conclusions of Law ("SUF"), Docket No. 17 (July 16, 2012), ¶ 8.) Price contends that the dismissal did not occur until later, namely, upon issuance of the arbitrator's decision and award. (SGI, ¶ 1.) It notes correctly, however, that the timing of the dismissal is not material to decision of the motion, which turns on whether Hartford correctly asserted that it had no duty to defend Price at the commencement of Clemmons' action. (Id.)

[5]SUF, ¶ 6. The Policy required that the personal or advertising injury be caused by an offense arising out of Price's business committed in the coverage territory during the policy period. (Id., ¶ 4.)

The Policy excluded coverage for personal or advertising injury "arising out of a breach of contract, except an implied contract to use another's 'advertising idea' in your 'advertisement,'" as well as personal or advertising injury "arising out of discrimination or humiliation committed by or at the direction of any 'executive officer,' director, stockholder, partner or member of the insured." It further excluded coverage for personal and advertising injury to "[a] person arising out of any 'employment-related practices,'" whether or not the insured might "be liable as an employer or in any other capacity."[6] "Employment-related practices" were defined as "[r]efusal to employ [a] person; . . . [t]ermination of that person's employment; or . . . [e]mployment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at a person."[7]

## B.    The Underlying Lawsuit

In 2001, Price hired Dr. Penny Clemmons as an attorney. Sometime thereafter, Clemmons became a partner in the firm. In 2009, Price terminated Clemmons, purportedly for misconduct. On October 23, 2009, Clemmons sued Price in Santa Barbara Superior Court (the "underlying action").[8] Clemmons alleged that Price had expelled her from the partnership because of her gender and in breach of the firm's partnership agreement.[9] She also asserted that partners at the firm had defamed her during the expulsion process by stating that she was being terminated for misconduct.[10] Clemmons' complaint pled claims for breach of contract, breach of the implied

---

[6]*Id.*, ¶ 5.

[7]*Id.*, ¶ 6.

[8]*Id.*, ¶ 1; Request for Judicial Notice in support of Hartford Insurance Company of the Midwest's Motion for Summary Judgment ("RJN"), Docket No. 20 (July 16, 2012), Exh. 6 (*Clemmons v. Price, Postel and Parma LLP*, Santa Barbara Superior Court Case Number 1340223).

[9]SUF, ¶ 2.

[10]*Id.*

3

covenant of good faith and fair dealing, employment discrimination, defamation, and violation of California's Unruh Act claims.[11] The defamation claim was based on the following allegation:

> "After the Firm was advised by Dr. Clemmons that it could not expel her from her Partnership on the alleged basis that her Partnership was 'incompatible' with the Firm, the Firm published to Dr. Clemmons and to other Partners and . . . to employees of the Firm and others, that she was expelled from the Firm because she was guilty of misconduct."

Clemmons alleged that this statement was slanderous *per se* under Civil Code § 46(3), because it tended to injure her in respect of her office, profession, trade or business by implying that she was generally disqualified to practice law. Price tendered the underlying action to Hartford; based on the defamation claim, Hartford agreed to defend the firm under a full reservation of rights. The insurer asserted a right to seek reimbursement of the fees and costs it incurred defending Price in the event of a finding of no coverage, citing *Buss v. Superior Court*, 16 Cal.4th 35, 39 (1997).[12]

The Clemmons case was ordered to binding arbitration pursuant to an arbitration provision in the partnership agreement. On October 28, 2011, arbitrators awarded Clemmons $618,994 plus interest on her breach of contract claim.[13] On November 2, 2011, Hartford filed this action, seeking reimbursement of the $678,814.23 in defense fees and costs it had expended.[14]

## II. DISCUSSION

### A.    Standard Governing Motions For Summary Judgment

A motion for summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

---

[11]*Id.*

[12]*Id.*, ¶ 7.

[13]*Id.*, ¶ 8.

[14]*Id.*, ¶ 9.

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.PROC. 56(c). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. See *id.* If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); FED.R.CIV.PROC. 56(e).

In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party. See *T.W. Electric Service, Inc. v. Pacific Electric Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987). The evidence presented by the parties must be admissible. FED.R.CIV.PROC. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. See *Falls Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49, 56 (2d Cir. 1985); *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## B. Duty to Defend

"An insurer 'owes a broad duty to defend its insured against claims that create a potential for indemnity.'" *Cort v. St. Paul Fire & Marine Ins. Cos.*, 311 F.3d 979, 983 (9th Cir. 2002) (quoting *Montrose Chem. Corp. v. Superior Court*, 6 Cal.4th 287, 295 (1993), in turn quoting *Gray v. Zurich Ins. Co.*, 65 Cal.2d 263 (1966)); see also *El-Com Hardware, Inc. v. Fireman's Fund Ins. Co.*, 92 Cal.App.4th 205, 213 (2001) ("The duty to defend arises on tender of defense and continues until the underlying lawsuit is concluded or until the insurer establishes, by reference to undisputed facts, the absence of any potential for coverage," citing *Montrose*, 6

5

Cal.4th at 300).

The duty to defend is broader than the duty to indemnify and may exist even when coverage is in doubt. *Cort*, 311 F.3d at 983. Thus, any doubts as to whether claims are covered must be resolved in favor of providing a defense to the insured. See *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal.4th 1076, 1081 (1993) ("Any doubt as to whether the facts give rise to a duty to defend is resolved in the insured's favor," citing *CNA Casualty of California v. Seaboard Surety Co.*, 176 Cal.App.3d 598, 607 (1986)).

"To determine whether the duty to defend is present, a court 'compares the allegations of the third party complaint with the terms of the policy.'" *Cort*, 311 F.3d at 983 (quoting *El-Com Hardware*, 92 Cal.App.4th at 212); see also *Horace Mann Ins. Co.*, 4 Cal.4th at 1081 ("The determination whether the insurer owes a duty to defend is usually made in the first instance by comparing the allegations of the complaint with the terms of the policy," citing *Gray*, 65 Cal.2d at 269). An insurer must defend "when the facts alleged in the underlying complaint give rise to a potentially covered claim regardless of the technical legal cause of action pleaded by the third party." *Barnett v. Fireman's Fund Ins. Co.*, 90 Cal.App.4th 500, 510 (2001). Only if the third-party complaint "can by no conceivable theory raise a single issue which could bring it within the policy coverage" is there no duty to defend. *La Jolla Beach & Tennis Club, Inc. v. Indus. Indem. Co.*, 9 Cal.4th 27, 39 (1994) (internal quotation marks omitted); see *CNA Casualty*, 176 Cal.App.3d at 606 ("[T]he duty to defend is so broad that as long as the complaint contains language creating the potential of liability under an insurance policy, the insurer must defend an action against its insured. . ."); see also *Storek v. Fidelity & Guaranty Ins. Underwriters, Inc.*, 504 F.Supp.2d 803, 808–10 (N.D. Cal. 2007) ("'California courts have repeatedly found that remote facts buried within causes of action that may potentially give rise to coverage are sufficient to invoke the defense duty,'" quoting *Pension Trust Fund for Operating Eng'rs v. Federal Ins. Co.*, 307 F.3d 944, 951 (9th Cir. 2002)).

"Facts extrinsic to the complaint [can] also give rise to a duty to defend when they reveal a possibility that the claim [alleged by the third-party plaintiff] may be covered by the policy." *Horace Mann*, 4 Cal.4th at 1081; see also *Gray*, 65 Cal.2d at 27 ("In determining whether or not

the [insurer] was bound to defend . . . courts do not examine only the pleaded word but the potential liability created by the suit"). "Since modern procedural rules focus on the facts of a case rather than the theory of recovery in the complaint, the duty to defend should be fixed by the facts which the insurer learns from the complaint, the insured, or other sources. An insurer, therefore, bears a duty to defend its insured whenever it ascertains facts which give rise to the potential of liability under the policy." *Gray*, 65 Cal.2d at 276-77; see also *Scottsdale Ins. Co. v. MV Transp.*, 36 Cal.4th 643, 654 (2005) ("[T]hat the precise causes of action pled by the third-party complaint may fall outside policy coverage does not excuse the duty to defend where, under the facts alleged, reasonably inferable, or otherwise known, the complaint could fairly be amended to state a covered liability"); *El-Com Hardware*, 92 Cal.App.4th at 217) ("The extrinsic facts known to respondent at the time appellants tendered their defense of the [third party] action, considered in light of the complaint's allegations, reveal a possibility of a covered claim").

Extrinsic evidence does not give rise to a potential of coverage, however, if it does not "pertain[ ] to claims actually asserted by the third party." *Storek*, 504 F.Supp.2d at 811 (citing, *inter alia*, *Horace Mann*, 4 Cal.4th at 1081 (stating that extrinsic facts "give rise to a duty to defend when they reveal a possibility that *the claim* may be covered by the policy" (emphasis added in *Storek*)); see also *id*. ("[A]n insurer owes no duty to defend based upon mere 'speculation' as to claims that a third party might have brought. 'An insured may not trigger the duty to defend by speculating about extraneous "facts" regarding potential liability or ways in which the third party claimant might amend its complaint at some future date. This approach misconstrues the principle of "potential liability" under an insurance policy,'" quoting *Gunderson v. Fire Ins. Exch.*, 37 Cal.App.4th 1106, 1114 (1995)).

**C.      Whether the Clemmons Action Fell Within the Employment-Related Practices Exclusion**

Hartford contends that it was not obligated to defend Price in the underlying action because all of Clemmons' claims fell within express exclusions in the Policy. It relies first on the employment-related practices exclusion ("ERPE"), which precludes coverage for personal and

advertising injury to a person "arising out of any 'employment-related practices.'"[15]  As noted, the policy defines "employment-related practices" as "[r]efusal to employ [a] person; [t]ermination of [a] person's employment; or [e]mployment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at a person."[16]  The term "arising out of" has been held to mean "incident to or having connection with." *Smith Kendal Real Estate v. Continental Casualty Co.*, 67 Cal.App.4th 406, 419 (1998) (quoting *Continental Cas. Co. v. City of Richmond*, 763 F.2d 1076, 1080 (9th Cir. 1985) ("'Arising out of' are words of much broader significance than 'caused by.'  They are ordinarily understood to mean '"originating from" "having its origin in," "growing out of" or "flowing from"' or in short, "incident to, or having connection with". . .'").  Hartford argues that the exclusion applies because all of Clemmons' causes of action arose out of employment-related actions.

Because they limit coverage, exclusions in insurance policies are strictly construed. Ambiguities in insurance contracts, moreover, are resolved against the insurer. *Loyola Marymount University v. Hartford Accident and Indemnity Co.*, 219 Cal.App.3d 1217, 1223 (1990).  In *Frank and Freedus v. Allstate Insurance Co.*, 45 Cal.App.4th 461 (1996), the court considered whether an exclusion virtually identical to that at issue here was ambiguous.  It concluded that the term "employment-related" was not ambiguous because it was used in the policy in its ordinary sense to mean "related to employment." *Id* at 471.  It further concluded that as defined and used in the exclusion, "employment-related" "modifie[d] . . . specified acts (including defamation) as well as the terms 'practices, policies, acts or omissions.'" *Id*.  It held that the "clear meaning of . . . the exclusion [was that it precluded] coverage for practices, policies, acts or omissions which are related to employment, including employment-related defamation." *Id*.  Similarly unambiguous is the fact that "employment-related practices" includes "termination of [a] person's employment."  The Ninth Circuit has held "that for an act or

---

[15]*Id.*

[16]*Id.*

omission to be 'employment related,' the relationship [between the act and a person's employment] must be direct and proximate." *HS Services, Inc. v. Nationwide Mutual Insurance Co.*, 109 F.3d 642, 647 (9th Cir. 1997).

Applying these definitions, California courts have held that an action for defamation arises out of an employment-related practice when a statement is made in the context of plaintiff's employment and is directed to plaintiff's job performance. See *Frank and Freedus*, 45 Cal.App.4th at 471-72 (defamation is "clearly employment related" when "[t]he statement was made in the context of [plaintiff]'s employment and its content is directed to [plaintiff]'s performance during employment"); see also *Golden Eagle Ins. Co. v. Rocky Cola Café, Inc.*, 94 Cal.App.4th 120, 127 (2001) ("to fall within the scope of the employment-related practices exclusion, a defamatory statement must, at a minimum, be made 'in the context of' the person's employment"); *Loyola Marymount*, 219 Cal.App.3d at 1222-23 (defamation that is "part and parcel of [an] allegedly wrongful termination of the plaintiffs' employment" is directly related to their employment and within an exclusion for personal injury sustained "as a result of an offense directly or indirectly related to the employment" of the person by the insured).

When the context of a remark is not the plaintiff's employment, however, the relationship between the remark and the employment is not sufficiently direct to support application of the exclusion. See *HS Services, Inc.*, 109 F.3d at 646 ("The remarks related directly to competition between Cade and Cade-Grayson in the marketplace and the latter's attempt to protect itself against a remark made by Cade, not as an ex-employee, but as a present competitor; that was their context. While it may be literally true that the remarks 'related' to Cade's employment, that relationship was too indirect and attenuated to qualify under the exclusion"); *Golden Eagle*, 94 Cal.App.4th at 128-29 ("the defamatory statement that Bollman was a 'sexually promiscuous and calculating bitch' was not made in the context of Bollman's employment," even though the statement was made by a supervisor to other employees).

### 1.    Clemmons' Defamation Claim

In its opposition, Price does not argue that Hartford's policy provided coverage for Clemmons' breach of contract, breach of the implied covenant of good faith and fair dealing, or

9

discrimination claims. Rather, it focuses its argument exclusively on the defamation claim Clemmons asserted, and contends that this claim fell within the policy's personal and advertising injury coverage and was not excluded by either the employment-related practices or breach of contract exclusions to that coverage. Because Hartford's motion specifically asserted that all of Clemmons' claims fell outside policy coverage, and because Price makes no argument in its opposition that any cause of action other than defamation fell within policy coverage, it has abandoned any such claim. See *Testa v. Town of Madison*, No. Civ.04-185-B-W, 2005 WL 2365319, * 12 (D. Me. Sept. 26, 2005) ("The Town argues that the existing record cannot support Testa's defamation claim. Testa fails to oppose this aspect of the motion in her opposition memorandum. Accordingly, Testa has abandoned her defamation claim and judgment should enter in favor of the Town on count II"); *Bayne v. Provost*, No. 1:04 CV 44, 2005 WL 1871182, *4 (N.D.N.Y. Aug. 4, 2005) ("The failure to oppose a motion for summary judgment on a certain claim is deemed abandonment of the claim"); *Akins Foods, Inc. v. American and Foreign Ins. Co.*, No. C04-2195JLR, 2005 WL 2090678, *4 n. 8 (W.D. Wash. Aug. 30, 2005) ("a party opposing summary judgment cannot simply rest on its allegations without any significant probative evidence supporting its claims. . . . By not bringing forward sufficient evidence or authority to oppose Defendant's motion for summary judgment, Akins has abandoned its claims" (internal citations omitted)); *Moss v. Technicolor, Inc.*, No. CV-99-05601-WJR (Mcx), 2001 WL 1472673, * 16 (C.D. Cal. May 4, 2001) ("This Court concludes that this claim should be dismissed because Plaintiffs have abandoned it. Plaintiffs failed to oppose Defendants' various attacks on these claims. As such, Plaintiffs failed to meet their burden on summary judgment of either affirmatively demonstrating that there is a genuine issue of material fact or that the law is in their favor. In other words, Plaintiffs have conceded this issue"). The court therefore considers only whether Clemmons' defamation claim required Hartford to defend.

Price first argues that Hartford cannot demonstrate there was a direct and proximate relationship between Clemmons' employment and the defamation she alleged.[17] In her complaint,.

─────────────

[17]See Opposition at 9.

Clemmons asserted that Price defamed her *after* she was expelled from the partnership; Price contends that because the pleading contained "no temporal limitations," the defamation may have occurred "well after" the employment relationship ended. Consequently, it asserts, the defamation claim cannot be said to be employment-related.[18]  Price's argument is unpersuasive.  Defamation is "clearly employment-related" when the statement in question was made, as here, "in the context of [plaintiff]'s employment and its content is directed to [plaintiff]'s performance during employment." *Frank and Freedus*, 45 Cal.App.4th at 471-72.  The complaint alleges that "[a]fter [Price] was advised by Dr. Clemmons that it could not expel her from [the] Partnership on the alleged basis that her [practice] was 'i[n]compatible' with the Firm, the Firm published . . . that she was expelled from the Firm because she was guilty of 'misconduct.'"[19]  As alleged, the purported defamation was directly tied to the reasons for Clemmons' expulsion from the partnership, and concerned a claim of "misconduct" during the time she practiced at Price.  This sufficiently alleges that there was a direct and proximate relationship between the defamation and an employment-related act, i.e., her termination as a partner in the firm.[20]  The court declines to

---

[18]*Id.*

[19]RJN, Exh. 6, ¶ 26.

[20]At the hearing, Price's counsel asserted that *HS Services* demonstrates there was no direct and proximate relationship between Clemmons' employment and the defamatory statements. Specifically, counsel argued that the statements in question may have been made by Price about Clemmons as "a competitor . . . in the community." Clemmons' complaint clearly pleads that, after she told the firm it could not terminate her because her practice was "incompatible" with its own, Price communicated to employees and others that she was guilty of misconduct. This shows a direct link between the termination decision and the alleged statements. To infer, as Price would have the court do, that the statements were made for competitive reasons, would require reading additional allegations into Clemmons' complaint for the purpose of finding coverage. *HS Services* does not mandate such a result.

In *HS Services*, third-party complainant Steven Cade was fired by Cade-Grayson in December 1991. *HS Services*, 109 F.3d at 643-644. By March 1992, he had formed a venture to compete with his former employer, and began to advise Cade-Grayson's vendors that it was experiencing financial difficulties and was a candidate for bankruptcy. *Id.* at 644. In response, a Cade-Grayson manager circulated a memo advising sales representatives to respond to inquiries regarding the company's financial status with the statement that Cade was fired for acts of

impose a further "temporal" requirement of the type Price identifies as a prerequisite to finding that a defamatory statement is "employment-related." First, it is clear that California courts do not require that the allegedly defamatory statement have been made prior to or at the moment of termination to be "employment-related." See *id.* at 473 & n. 4 (concluding, although "the record [was] unclear as to when the alleged defamation occurred" – i.e., during or after the termination of plaintiff's employment – the statement was employment-related because "the exclusion applies to all personal injuries arising not only during employment but also due to a 'refusal to employ' and to 'termination of employment'");[21] see also *Low v. Golden Eagle Ins. Co.*, 104 Cal.App.4th 306, 314 (2002) ("We agree, first, with the conclusion reached by the courts in all four [cases surveyed] that the mere fact the alleged tort sued on arose *after* the employment relationship had

---

dishonesty; it was these statements that formed the basis for Cade's defamation claim. *Id.* The Ninth Circuit distinguished *Frank and Freedus*. It noted that there, the allegedly defamatory statement was "directly related to employment in that it related to the employer's attempts, as employer, to explain the termination to its other employees." By contrast, it stated, "the purpose of the remarks [about which Cade complained] was to protect Cade-Grayson in the marketplace." *Id.* at 646. The court held "that to 'arise out of' a termination of employment, the defamatory remark at issue must have been a part of or [must have] directly and proximately resulted from the termination." *Id.* at 647. Applying this standard, it concluded that the defamatory remarks "were not part of Cade's termination, and their proximate cause was Cade's own remark in the marketplace, made as a competitor, concerning Cade-Grayson's financial condition. Thus, the chain of causation between the termination and the remarks was broken." *Id.* The court also held that "for an act or omission to be 'employment related,' the relationship must be direct and proximate." *Id.* at 647. Here, as noted, the direct inference to be drawn from the facts alleged in Clemmons' complaint is that the allegedly defamatory remark was made in connection with the firm's decision to terminate her as a partner and in an effort to justify that decision to employees and third parties. There are simply insufficient facts alleged in Clemmons' complaint to infer that the statement was made for competitive reasons. Nor is there any evidence that Price presented extrinsic evidence suggesting a competitive purpose to Hartford.

[21]In *Frank and Freedus*, the underlying complaint alleged the defamatory statement as follows: "'"When [the office administrator] later discussed with Defendant Freedus that staff morale was low because of the decision to terminate Caprow when others remained who had shorter tenure and/or performance problems, Defendant Freedus dismissed Caprow's importance with the comments that he is 'likely gay and probably has AIDS' and then instructed [the office administrator] to inform staff that the 'real reason' for his termination was 'failure to perform and develop as an associate.'" See *Frank and Freedus*, 45 Cal.App.4th at 465.

ceased cannot, per se, serve to take the case out of the ambit of the ERP exclusion"). While the *Low* court stated that one of the relevant factors in assessing whether a statement was "employment-related" is the temporal proximity of the statement to the employment, *Low*, 104 Cal.App.4th at 314, it did not impose an outside limit on the period of time that can pass before a statement will not be deemed "employment-related." Nor, as discussed *infra*, did it conclude that temporal proximity is the only relevant factor. Here, the complaint clearly suggests that Price began to make the allegedly defamatory statements shortly after Clemmons challenged the basis for her termination. That adequately pleads that there was temporal proximity between her employment and the statements.

In addition to arguing that, on the face of Clemmons' complaint, the timing of the allegedly defamatory remarks was uncertain, Price also asserts that Clemmons' complaint did not plead sufficient facts to permit Hartford to conclude that the content of the statements was employment-related. It contends, for example, that Clemmons' claim could have been based on a comment by a Price partner during a telephone call with another Santa Barbara lawyer that Clemmons was "bad news."[22] The court need not indulge in such speculation, because the complaint clearly states the content of the allegedly defamatory statement: "After the Firm was advised by Dr. Clemmons that it could not expel her from her Partnership on the alleged basis that her Partnership was 'incompatible' with the Firm, the Firm published to Dr. Clemmons and to other Partners and . . . to employees of the Firm and others, that she was expelled from the Firm because she was guilty of misconduct."[23] As is evident, Clemmons alleged that Price communicated she had been expelled from the firm for misconduct. There is no ambiguity, and Price cannot trigger policy coverage by speculating about possible defamatory statements the firm might have made beyond that pled by Clemmons.

As noted, the *Low* court identified three factors that bear on the "ultimate determination" whether an ERPE is applicable to a defamation claim: (1) the temporal proximity between the

---

[22]Hearing Transcript (Sept. 10, 2012), 10:26:58.

[23]RJN, Exh. 6, ¶ 26.

allegedly defamatory statement and the third party plaintiff's employment by the insured; (2) the nexus between the allegedly defamatory statement and the third party plaintiff's employment by the insured; and (3) the existence (or nonexistence) of a relationship between the employer and the third party plaintiff *outside* the employment relationship. See *Low*, 104 Cal.App.4th at 314. Here, there is a clear nexus between the allegedly defamatory statements and Clemmons' employment with Price, as the statements concerned the purported reason for her expulsion and alleged "misconduct" during her association with the firm. See *Frank and Freedus*, 45 Cal.App.4th at 471-72 (defamation is employment-related if the statement is "made in the context of [the third party plaintiff's] employment and its content [was] directed to [her] performance during employment"). Additionally, there is no evidence of a non-employment relationship between Clemmons and Price. Finally, as noted, Clemmons' pleading indicates that when she challenged her expulsion as a partner on the basis that the reason given for it was not a valid basis for expulsion under the partnership agreement, Price responded that she had been expelled due to "misconduct." Whether this statement was made before or after Clemmons was formally expelled, it is clear that it occurred near the time of the expulsion decision, such that it was sufficiently temporally proximate to the decision that even the first of the relevant factors supports application of the exclusion. See *id.* (noting that in *Loyola Marymount* and *Frand and Freedus*, "the defamatory remarks *came on the heels of the employee's termination* (emphasis added)). Consequently, all of the factors identified by the *Low* court support a finding that Clemmons' defamation claim was excluded from coverage.

## 2. Clemmons' Status as a Partner

Price next argues that the ERPE does not apply because Clemmons was a partner rather than an employee of the firm.[24] It contends that the arbitration panel's decision and award "made very clear" that it was "not dealing with an employee agreement," but with "an agreement between partners."[25] Price cites no direct authority for the proposition that the partner-employee

---

[24]Opposition at 1.

[25]*Id.* at 8.

14

distinction renders the ERPE inapplicable,[26] and the language of the exclusion does not support its position. The EPRE excludes from coverage "'[p]ersonal and advertising injury' to: (1) *[a] person* arising out of any 'employment-related practice.'. . . This exclusion applies: (1) Whether the insured may be liable as an employer or in any other capacity. . ." (emphasis added).[27] There is no express language that limits application of the exclusion to situations in which the injured party is an employee of the insured. Similarly, the definition of "employment-related practices" does not limit application of the exclusion only to situations in which the injured person is an employee of the insured, given that that term is defined not only as refusal to employ a person and termination of a person's employment, but also as "[e]mployment-related practices, policies, acts or omissions, such as . . . defamation . . . directed at a person."[28]

---

[26]Price cites a comment by Justice Powell in his concurring opinion in *Hishon v. King & Spalding*, 467 U.S. 69 (1984): "The relationship among law partners differs markedly from that between employer and employee – including that between the partnership and its associates." *Id.* at 79-80. *Hishon* dealt with Title VII of the Civil Rights Act, however, not proper construction of an exclusion in an insurance policy.

[27]SUF, ¶ 6.

[28]Price relies on a publication of the International Risk Management Institute – the annotated Commercial General Liability policy ("Annotated CGL"). "[T]he presence of standardized industry provisions and the availability of interpretive literature are of considerable assistance in determining coverage issues." *Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal.4th 645, 670 (1995). The section of the publication cited by Price concerns an exclusion in commercial general liability policies for bodily injury to an employee arising out of and in the course of employment by the insured or while performing duties related to the conduct of the insured's business. The publication explains that changes were made to the exclusion in the 1993 form commercial general liability policy due to the fact that employee was a defined term in that policy form and included "leased workers." It notes that the exclusion references "performing duties related to the conduct of the insured's business" to make it applicable to leased workers "whether or not they are legally considered to be 'employed.'" (Appendix of Authorities, Docket No. 24 (August 3, 2012), Exh. A, Annotated CGL at V.D.20-21.)

Price cites a portion of the discussion that states: "Liab[ility] 'as an employer or in any other capacity' still refers only to the insured who is the employer of the injured employee, but who may also have a liability exposure connected to some additional relationships with the employee." As can be seen, the portion of the Annotated CGL Price cites does not address the exclusion that is at issue in this case. While "[w]ords used in a certain sense in one part of an instrument are deemed to have been used in the same sense in another," H. Walter Croskey et al.,

Price contends, however, that the phrase "whether the insured may be liable as an employer or in any other capacity" is ambiguous, and "cannot be stretched beyond the employer/employee relationship."[29] Price cites *North American Building Maintenance, Inc. v. Fireman's Fund*, 137 Cal.App.4th 627 (2006) ("*NABM*"), as support for its position.[30] There, the insured, NABM, provided commercial janitorial services to other companies, including Target, but subcontracted with California Building Management Services ("CBMS") to perform the actual work. CBMS employees sued NABM and Target alleging, *inter alia*, false

CAL. PRACTICE GUIDE: INSURANCE LITIGATION, § 4:170 (The Rutter Group 2010), this is not invariably the case. See *Legacy Vulcan Corp. v. Superior Court*, 185 Cal.App.4th 677, 693 (2010) (the term "underlying insurance" was held to have a different meaning in the excess coverage portion of the policy than in the umbrella coverage's reference to defense of claims "not within the coverage of underlying insurance"). The policy Hartford issued to Price contained both an exclusion for bodily injury to an employee and one for personal and advertising injury to a person arising out of any employment-related practice. It is the latter exclusion that is at issue in this case. Like the exclusion for bodily injury to an employee, the employment-related practices exclusion states that it applies "[w]hether the insured may be liable as an employer or in any other capacity." The Annotated CGL notes that this phrase "can be interpreted to mean 'whether the insured is the injured person's employer or not." (Annotated CGL at V.D.21.) It concludes, however, that *in the context of the exclusion for bodily injury to an employee*, such an interpretation "fails to take into account the opening language of the exclusion, which limits its applicability to injury to an employee of 'the insured.'" (*Id.* at 22.) It observes that "[t]he term '*the* insured' has been uniformly held by the courts – and is understood by the insurance industry itself – to be a reference to the insured against whom a claim has been made and who is seeking coverage under the policy." (*Id.* (emphasis original).) Thus, it cautions that "[l]iable as an employer or in any other capacity" must be interpreted in "the context of the rest of the exclusion. (*Id.*) The employment-related practices exclusion, by contrast, does not reference to personal or advertising injury suffered by "an employee of the insured." Rather, it excludes coverage for personal or advertising injury to "[a] *person*" arising out of employment-related practices. As discussed *supra*, employment-related practices is a defined term. Given the emphasis the Annotated CGL places on the introductory "employee of the insured" language in the bodily injury exclusion, and the fact that that language does not appear in the employment-related practices exclusion, the court concludes that this is an occasion on which the phrase "liable as an employer or in any other capacity" should be interpreted differently in different portions of the policy.

[29]Opposition at 1.

[30]*Id.* at 10.

16

imprisonment claims. *Id.* at 630-31. NABM tendered defense of the action to Fireman's Fund, *id.* at 631, which declined to defend, invoking the employment-related practices exclusion. It noted specifically the fact that the exclusion applied "whether the insured is liable as an employer or in any other capacity." *Id.* at 634-35. The court concluded that the language of the EPRE was ambiguous, noting: "We find no unmistakable meaning to the term 'as an employer or in any other capacity.'" *Id.* at 641. Citing the interpretative principles that ambiguous terms in insurance policies must be interpreted so as to protect the reasonable expectations of the insured, *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1264-65 (1992), and that it is the insurer's burden to show that an exclusion applies, *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 16 (1995), the court held that because the exclusion referenced refusal to employ, termination of employment, and employment-related practices, policies, acts or omissions, "a commonsense and, thus, reasonable understanding of this category of claims is that [the exclusion] relates to actual, former, or prospective employment." *Id.* at 642. The court stated that its conclusion was reinforced by the fact that in the 1990's, the insurance industry created a new form of coverage – employment-related practices liability – that companies could buy to obtain coverage not otherwise available to them because of the ERPE. That coverage, it stated, extended to claims by an employee, former employee or applicant for employment, but not claims by an independent contractor, or any employee of an independent contractor. *Id.* at 643. The court observed that it could identify no reason why an insured that had "purchased the extra coverage of the EPL endorsement would not, in the absence of clear language to the contrary, reasonably interpret that coverage as being coextensive with the like-named EPL exclusion." *Id.*[31]

Other courts have disagreed with *NABM*. In *Insurance Commissioner v. Golden Eagle Ins. Co.*, No. A111416, 2007 WL 908519 (Cal. App. Mar. 27, 2007) (Unpub. Disp.), the court considered a case in which an employee of one of two companies that shared office space and had

---

[31]Because neither party has submitted a copy of the entire policy, the court cannot determine whether Price purchased employment-related practices liability coverage.

the same corporate officers sued both companies alleging sexual harassment. *Id*. at *1.[32] The court concluded that the insured, which was *not* the bookkeeper's employer, was not entitled to coverage due to the employment-related practices exclusion in the policy. *Id*. at *6. It held that the type of injuries the plaintiff alleged were "clearly 'employment-related,'" and continued:

> "As the 1996-1997 version of the ERP makes clear, the policy excludes coverage
> for complaints of unlawful employment practices brought by a 'person.' There is
> no requirement in either version of the ERP exclusion that the 'person' bringing
> such employment-related complaints be an employee of the insured. To read in
> such a requirement would run counter to settled California law holding claims for
> post-termination conduct brought by former employees may fall within an ERP
> exclusion. Our conclusion is further supported by policy language stating that the
> ERP exclusion applies to claims arising out of employment-related practices
> '[w]hether the Insured may be held liable as an employer or in any other capacity.
> . . .' This language reinforces the broad definition of claims to be excluded – i.e.,
> all claims arising out of employment-related practices, regardless of the basis for
> asserting liability against the insured." *Id*.

In reaching this conclusion, the court disagreed with the *NABM* court's ambiguity finding. It stated:

> "The court's finding of ambiguity in *NABM* was not based on the entirety of the
> ERP exclusion but focused only on the phrase stating the exclusion applied
> '[w]hether the insured may be liable as an employer or in any other capacity.'
> Although the *NABM* court states (twice) that it 'find[s] no unmistakable meaning'
> to this phrase, we believe that in most contexts the meaning of the sentence in

---

[32] "Although the court is not bound by unpublished decisions of intermediate state courts, unpublished opinions that are supported by reasoned analysis may be treated as persuasive authority." *Scottsdale Ins. Co. v. OU Interests, Inc.*, No. C 05-313 VRW, 2005 WL 2893865, *3 (N.D. Cal. Nov. 2, 2005) (citing *Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n. 8 (9th Cir. 2003) ("[W]e may consider unpublished state decisions, even though such opinions have no precedential value")).

which it appears will be reasonably clear. The full sentence suggests that coverage

for employment-related practices will be excluded, regardless of whether a claim

seeks to hold the insured liable as an employer or in some other role. The passage

represents the insurer's attempt to broaden the scope of the exclusion to ensure that

it will apply in situations like the one before us, in which liability is asserted by one

who may be technically a non-employee." *Id.* at *7 (citations omitted).

The *Golden Eagle* court noted that the interpretation adopted by the *NABM* court was "undoubtedly influenced" by the "unique facts" of the case, i.e., the fact that the employer was a totally separate and distinct company from the insured, and by the fact that the policy in *NABM* provided coverage for wrongful employment practices. The policy interpreted in *Golden Eagle*, by contrast, did not provide such coverage. *Id.* ("[T]he *NABM* court interpreted the [ERPE and the employment-related endorsement] together and reached the reasonable conclusion *for that policy* that the scope of the ERP exclusion was limited to claims brought by former, current or prospective employees. No corresponding coverage for 'wrongful employment practices' exists in the two Golden Eagle policies before us. Without this predicate, there is no reason to import *NABM's* analysis to the different facts and policies involved in this case" (emphasis original)).[33]

Neither *NABM* nor *Golden Eagle* addressed the particular issue raised by this case – whether the employment-related exclusion applies when the third party plaintiff was a partner in the insured business. Courts in other jurisdictions have considered this question, however, and concluded that the exclusion applies. See *System Design Concepts, Inc. v. CNA Ins. Co.*, 2006 WL 2191963, *5-6 (N.J. Super. Aug. 4, 2006) (affirming the trial court's holding that a suit by a "partner and shareholder" that alleged a variety of claims related to his expulsion from the company fell within the employment-related practices exclusion and the insurer therefore had no duty to defend); see also *Potomac Ins. Co. of Illinois v. Peppers*, 890 F.Supp. 634, 644-45 (S.D.

---

[33]The authors of the Rutter Group treatise cite *NABM* as a case demonstrating that words or phrases in insurance policies cannot be read in isolation, but must be considered in context. See H. Walter Croskey et al., PRACTICE GUDE: INSURANCE LITIGATION, § 4:170 (The Rutter Group 2010).

Tex. 1995) (concluding that the "employment-related practices, policies, acts or omissions" exclusion barred coverage for a defamation claim brought by one partner against another).

Courts other than the *Golden Eagle* court, moreover, have disagreed with *NABM* in contexts other than partner vs. partnership disputes. See, e.g., *Stewart Johnston Pumps, Inc. v. Nationwide Mut. Ins. Co.*, 2d Civil No. B151575, 2002 WL 432605, *3-4 (Cal. App. Mar. 20, 2002) (Unpub. Disp.) (concluding that an analogous ERPE applied in a case where the third-party plaintiff was not an employee of the insured, but instead a temporary worker hired from a separate agency, because the plaintiff was a "borrowed servant," and "[m]ore importantly, [because] the policy excludes coverage where a 'person' claims bodily injury or personal injury for employment-related harassment. The exclusion does not require that the 'person' be an employee of the insured"); see also *George S. May Intern. Co. v. Arrowpoint Capital Corp.*, No. 2011 CA 1865, 2012 WL 3264397, *7 (La. App. Aug. 10, 2012) ("[A] review of the language of the ERPE demonstrates that it does not limit its applicability to those individuals who have an employment relationship with the insured. Instead, the ERPE applies to 'bodily injury' or 'personal and advertising injury' to a 'person,' but nothing in the ERPE requires that the injured person be an employee of the insured").

In sum, having considered all of the relevant provisions in Hartford's policy, and having noted the differing language used in the exclusion for bodily injury to an employee and the exclusion for personal and advertising injury to a person arising out of employment-related practices, the court concludes that the employment-related practices exclusion is not ambiguous. See *Fire Ins. Exch. v. Superior Court (Altman)*, 116 Cal.App. 4th 446, 454 (2004) ("Ambiguity is not necessarily to be found in the fact that a word or phrase *isolated from its context* is susceptible of more than one meaning. . . . An insurance policy must be interpreted as a whole and in context"(emphasis added; internal quotation marks omitted)); see also *Boeing Co. v. Continental Cas.*, 157 Cal.App.4th 1258, 1266 (2007) (same); *Safeco Ins. Co. v. Gilstrap*, 141 Cal.App.3d 524, 532-33 (1983) ("Although we construe all provisions, conditions, or exceptions that tend to limit liability strictly against the insurer, strict construction does not mean strained construction. We may not, under the guise of strict construction, rewrite a policy to bind the

insurer to a risk that it did not contemplate and for which it has not been paid" (internal citations omitted)). Because the allegedly defamatory statements were made in the context of Clemmons' separation from the firm, and concerned her performance as an attorney while there, her defamation claim fell directly within the ERPE.[34] Summary judgment is thus appropriately entered in Hartford's favor.[35]

### III. CONCLUSION

For the reasons stated, Hartford's motion for summary judgment is granted.

DATED: November 21, 2012

_Margaret M. Morrow_
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

---

[34]Because the court concludes that the employment-related practices exclusion applies, it need not address Hartford's argument that coverage for the defamation claim was excluded because it arose out of a breach of contract and thus fell within the exclusion precluding coverage for "'[p]ersonal and advertising injury' arising out of a breach of contract. . . ."

[35]As noted, Price failed to address Hartford's argument that Clemmons' breach of contract, breach of the covenant of good faith and fair dealing, and discrimination claims were not covered by the policy.